STATE OF MAINE
HANCOCK, SS.

SUPERIOR COURT
CIVIL ACTION
Docket No. AP-06-10
JLH-HAN- 10/15,2007

Penny Weinstein et al.,
    Plaintiffs

v.

Town of Dedham,
    Defendant

Order on Appeal

and

DONALD L. GARBRECHT
LAW LIBRARY

JAN 30 2008

Dale Henderson Logging, Inc.
    Intervenor

Pursuant to Town of Dedham, Maine Subdivision Ordinance ("Ordinance") § X and M.R.Civ.P. 80B, Penny Weinstein and Guardians of Green Lake[1] (collectively, Weinstein) appeal from a decision of the Town of Dedham Planning Board, approving a permit application filed by Dale Henderson Logging, Inc. (DHL) for the development of a residential subdivision on 396 acres of land in Dedham. In this appeal, Weinstein argues that the Board erred in granting DHL's application because the proposed development failed to satisfy several criteria required of a proposed project such as the one at issue, because the application review process did not conform to the procedural requirements established in the applicable ordinance, and because the Board failed to issue adequate findings of fact. For the reasons set out below, the court remands the case to the Board for issuance of further findings of fact on one issue. Otherwise, the court affirms the Board's decision.

---

[1] The Guardians of Green Lake is an unincorporated association of people who are both residents and non-residents of Dedham, who, as they describe it in the complaint, formed the advocacy group "to protect the water quality of Green Lake and the quality of life enjoyed in the surrounding area."

1

The development at issue in this case is known as Jellison Brook Phase II. It consists of a proposal to create forty residential lots, which would be between 2 and 5 acres in size. More than 250 acres would remain undeveloped and protected by a conservation easement. Phase II represents an expansion of a development (Jellison Brook Phase I) that the Dedham Planning Board approved in May 2004. Phase I is a subdivision of fourteen lots on 106 acres of land that abuts the site of Phase II. DHL filed a subdivision application with the Board. *See* R. 1-129. The Board gave preliminary approval to the plan in July 2005, following a public hearing. *See id.* at 164-65. Subsequent to an additional public hearing held in August 2006, the Board gave final approval to the plan. *See id.* at 354-63 (Board's findings and conclusions). Weinstein filed a timely appeal from that decision.

In a rule 80B action, the burden of persuasion rests with the party challenging the local decision. *Twigg v. Town of Kennebunk*, 662 A.2d 914, 916 (Me. 1996). On appeal, the court reviews the municipal decision for "errors of law, abuse of discretion, or findings not supported by substantial evidence in the record." *Griffin v. Town of Dedham*, 2002 ME 105, ¶ 6, 799 A.2d 1239, 1241. "Substantial evidence exists when a reasonable mind would rely on the evidence as sufficient support for a conclusion." *Forbes v. Town of Southwest Harbor*, 2001 ME 9, ¶ 6, 763 A.2d 1183, 1186. An agency's "decision is not wrong because the record is inconsistent or a different conclusion could be drawn from it." *Twigg*, 662 A.2d at 916. A planning board's interpretation of a municipal ordinance, however, is a question of law subject to *de novo* review. *Nugent v. Town of Camden*, 1998 ME 92, ¶ 7, 710 A.32d 245, 247.

## A. Layout of road systems

Weinstein first challenges the Board's treatment of the requirements for the proposed road system, as those requirements are established in the Ordinance. The relevant provision of the Ordinance provides:

> Any development containing ten (10) or more dwelling units or lots shall have at least two (2) road connections with existing public roads, roads shown on an Official Map, or roads on an approved development plan for which performance guarantees have been filed or accepted.

Ordinance § XVII(B)(5). Weinstein argues that the subdivision plan does not provide for two "road connections" between the roads in the Phase II development and other ways of

2

the types described in the legislation. She also contends that the Board's factual findings on this point are inadequate.

In fact, the Board issued a finding that there are two roads external to the subdivision that connect with the roads inside the subdivision. *See* R. 357 ("The subdivision area is accessed by Jellison Hill Road and Grand View Drive."); *see also* R. 371 (map of proposed subdivision as approved by the Board, showing, among other things, location of roads).[2] When seen narrowly, this written finding might be seen to describe merely the relationship between external roads and the "area" of the subdivision generally. However, that is all that the ordinance requires. Even if the ordinance is construed to mandate a connection between the external roads and the roads (as opposed to the "development" itself), the context of that finding and the map of the subdivision as the Board approved it make clear that the Board's finding was based on the proposal that would connect the two roads inside Phase II with two roads outside of the development. Thus, the Board's findings set out the basis for its conclusion that the development meets the standard established in the ordinance.

Weinstein also argues that the evidence does not support the Board's finding that there exist two "road connections" to the development. As approved by the Board, there would be two separate roads within the confines of Phase II: the Jellison Hill Road, and Grand View Drive. Those two roads intersect outside of the bounds of Phase II. Grand View Drive is a road that branches off of the Jellison Hill Road, so that at the intersection, one may continue on the Jellison Hill Road and cross onto the site of Phase

---

[2] Weinstein argues that the Board's findings may indicate that it granted DHL a waiver of the road requirements set out in the ordinance and that a waiver constitutes error because is not permitted in this context. Although the specter of a waiver was raised earlier in the course of the municipal proceeding, *see* R. 369, in fact the Board ended up addressing the "road connection" requirement as is noted in the text of this order.

In the context of discussing the propriety of a waiver, Weinstein argues that safety issues are implicated by the configuration of roadways within Phase II: a waiver is permitted only on issues that do not implicate safety considerations. *See* Ordinance at § XXIV. Because the Board in fact found that the plan offers two road connections, it is not necessary to resort to safety considerations embodied in the waiver standards. Thus, because the Board found that there are two points of connections between the development and outside roads, the only question that Weinstein's argument raises is whether there was sufficient evidence to support the Board's conclusion that the plan included the requisite number of road connections.

3

II, or one may turn left from the Jellison Hill Road onto Grand View Drive, which also then passes onto the Phase II site. Thus, contrary to Weinstein's argument here, there simply are two connections between the development and roads that are located beyond the boundaries of the proposed development, and the Board's conclusion was supported by the evidence.

### B. Adequacy of the water supply

Weinstein next argues that there was insufficient evidence for the Board to determine that there would be an adequate water supply for Phase II. The Ordinance provides that, in approving applications, the Planning Board must find that "[t]he proposed subdivision has sufficient water available for the reasonably foreseeable needs of the subdivision." Ordinance § IV(B); *see also* 30-A M.R.S.A. § 4404(2). Further, applicants must provide the Planning Board with

> a letter including calculations of subdivision's foreseeable water needs, certifying that sufficient, healthful water for the reasonably foreseeable needs of the subdivision is available, prepared by a licensed well-driller knowledgeable of the area, or other qualified professional.

Ordinance § XII(C).

The Board explicitly found that "[t]he proposed subdivision has sufficient water available for the reasonably foreseeable needs of the subdivision." *See* R. 356. In reaching its decision, the Board stated that a letter received by Alfred Haskell of Water Wells Inc. established the sufficiency of the water supply, which is to be provided by individual wells. *See id.* at 20, 356. In the letter, Haskell wrote, "We have been in the well drilling business for over thirty-five years and have drilled a number of wells in the area of the proposed subdivision. Those wells have always produced an adequate supply of water." *See id.* at 20. The Board further relied on calculations submitted by Kiser & Kiser Company, demonstrating Phase II's foreseeable water needs. *See id.* at 369. Finally, the Board relied on information received by Northeast Laboratory Services attesting to the quality of water from wells in the area of the subdivision. *See id.* at 21-25.

This evidence provided support for the Board's finding that there exists a sufficient water supply pursuant to Maine statutory law and section IV(B) of the Ordinance. Northeast Laboratory Services provided evidence of the water source's

4

quality; Kiser & Kiser Company submitted evidence of Phase II's water needs; and Haskell's letter constituted evidence that the wells would provide enough water for Phase II. The Board was entitled to credit these representations in reaching its decision.

Weinstein particularly challenges the sufficiency of evidence in Haskell's letter, by arguing that the letter is not specific as to Phase II and fails to state that wells that would be used in the subdivision would be sufficient to provide for the approximately forty new homes that Phase II would add. In other words, she contends that Haskell's letter did not provide the information that would satisfy section XII(C) of the ordinance. Despite the general nature of Mr. Haskell's letter, the Planning Board reasonably inferred from his letter that he was not only addressing the adequacy of area wells but also of those wells that would supply Phase II residents with water. In sum, his letter was sufficient to satisfy the requirements of Ordinance Section XII(C).

## C. Stormwater calculations and plans

Section XII(C) of the municipal ordinance requires that an application for a major subdivision such as Phase II must include, among other things, "[s]tormwater runoff calculations, modeling pre-development and post-development conditions, using either SCS's TR-55 or TR-20 methodologies. . . ." The ordinance goes on to identify specific components of the submission relating to these calculations. Although DHL's application included some information about stormwater runoff management, *see* R. 120-29, that material did not include the specific material required by the ordinance. *See* R. 368 (letter from the Board's engineering consultant, pointing to the absence of stormwater calculations and plans). Weinstein argues that the omission of this material from DHL's application is fatal and that the Board consequently erred by approving the application and issuing the permit.

In specific and specified circumstances, the Ordinance allows the Board to accept an application that does not include all of the requisite components: "where the Board makes written findings of fact that there are special circumstances of a particular site proposed to be subdivided, it may waive portions of the *submission* requirements, provided the public health, safety and welfare are protected." Ordinance § XXIV(A) (emphasis added). Although the Board's findings address some aspects of the effects of the development on stormwater runoff dynamics, the Board did not explicitly address the

5

application's failure to cover all of the stormwater matters identified in the Ordinance. Thus, if the Board intended to waive that part of the submission requirements, it did not articulate the basis for its conclusion that a waiver was justified under section XXIV(A). The absence of such findings makes it impossible for the court to engage in meaningful review of that implicit decision to waive portions of the submissions requirements or to even determine if that was the Board's course of action. *See generally Carroll v. Town of Rockport*, 2003 ME 135, ¶ 27, 837 A.2d 148, 156; *Chapel Road Associates LLC v. Town of Wells*, 2001 ME 178, ¶ 10, 787 A.2d 137, 140. Consequently, the court remands this action to the Board so that it may issue findings of fact that are sufficient to apprise the court of the nature of and basis for the Board's decision as its relates to the incomplete application submitted by DHL.

For their part, DHL and the Town focus their arguments on the fact that section IV requires only that "[t]he proposed subdivision will provide for adequate storm water management." Ordinance § IV(P). Those parties argues that there was adequate evidence on the record for the Board to reach this determination and that the additional material would not have added "significant, meaningful information" to the administrative record. (Town of Dedham's Br. at 8.) This, however, does not dispose of the issue flowing from the absence of information that is required to be contained in the application. It is for the Board, not the court – at least as the case is presently postured --, to make such an assessment.

### D. Compliance with administrative process

Weinstein finally argues that the Board failed to comply with the procedural course for subdivision review and approval, as that course is established in the ordinance. *See* Ordinance § X. In relevant part, the Ordinance provides that a public hearing is to be held on an applicant's preliminary plan for a major subdivision and that within 30 days of that hearing, the Board must either approve, approve conditionally or disapprove the plan. *See* Ordinance § X(A) Step 6. Within six months of the Board's approval or conditional approval, the applicant must file a complete subdivision plan with the Town's CEO. If the applicant fails to do so within that six-month period, then the preliminary plan shall be "re-reviewed" as in the first instance. *See id.* § X(A) Step 7. The application is deemed received when the CEO certifies that it is complete. *See id.* X(A)

6

Step 8. The six-month filing period is tolled during the time the CEO reviews the preliminary plan for completeness. *See id.* § X(A) Step 7. The final plan is then ready to be included on the Board's agenda for final plan review. *See id.*

Here, the Board held a public hearing on DHL's preliminary application on July 21, 2005, and conditionally approved the plan that day. *See* R. 164 (conditional "acceptance" of plan[3]), 166-72. This triggered the six-month period in which DHL was to file a complete subdivision plan. The Board held a meeting on October 13, 2005. According to the minutes of that meeting, DHL had submitted much of the information required of a final plan (step 7) in September and supplemented those submissions with additional material on the meeting date. *See* R. 175. From this, one might conclude – as the Town and DHL argue – that as of the October 13 meeting, DHL's application for a final plan was complete and that it had thereby met the six-month filing deadline. Despite the account of the application's status in those minutes, however, the Board later summarized the procedural history of the application to reveal that there was outstanding information even as of the October meeting date and that omission continued until March 2006. *See* R. 354-55. In March 2006, the Board concluded that the application was complete, *see* R. 179, but that the application process should start over. *See* R. 355. The decision to require a recommencement of the process would not have been necessary if DHL's final plan application had been complete as of the October 2005 hearing date. It also would have been unnecessary if the Board has assigned a sufficient tolling effect between the July 2005 meeting and the March 2006 meeting, attributable to the CEO's review of the completeness of the application. Because the Board decided that the process would need to start anew, it must have concluded that more than six months of the time that passed between those two meeting dates was not caused by the CEO's completeness review. Thus, the court can only conclude here that DHL had not met the six-month deadline to file a complete application as required by Ordinance § X(A) Step 7.

---

[3] Although the Board characterized its action as an "accept[ance]," in substance that disposition was an approval subject to conditions.

From this conclusion, Weinstein argues that the Board did not actually implement the first six steps of the application process, which govern the filing and consideration of a preliminary plan. For at least two reasons, Weinstein is not entitled to relief.

First, although it did so on in an accelerated format, the Board followed the first six steps of the review and approval process outlined in the ordinance. As of March 2006, DHL had already submitted an application and considerable supporting material. The application was deemed complete at that time. At a meeting held on July 13, 2006, the Board members specifically discussed the procedural status of the application, and the Board ultimately agreed that there was no need to conduct a second public hearing on a preliminary application and that a public hearing on the final plan should be scheduled. [4] Because the application was complete, it was in order for a public hearing as a final plan. The ordinance does not require the Board to hold a public hearing on a final plan proposal; rather, under the ordinance, the Board "may" hold such a hearing. *See* Ordinance § X, Step 11 (emphasis in original). The next day, a Notice of Public Hearing was issued. *See* R. 260. The notice advised that DHL sought a final plan review for the Jellison Brook Subdivision, Phase 2 and that the Board would hold a public hearing and then review the final plan at a meeting to be held on July 27. *Id.* The Board in fact held a public hearing on July 27 and, at its August 10 meeting, approved the application. *See* 190-91.

The ordinance does not establish a procedure that prevents the consolidation of the preliminary plan review process with the process that involves consideration of the final application plan. Steps 1 through 6, which govern the preliminary plan review process, establish a series of steps and deadlines. Those time limitations are maximum time periods and do not purport to establish minimum durations, such as mandatory waiting periods. Further, Weinstein does not argue that the preliminary application and review process includes factors that are outside of the scope of the final plan review process. Thus, considerations relevant to the former are subsumed in the latter. The

---

[4] The meetings from the July 13 minutes are not included in the record filed separately by the parties but rather were filed by agreement as a supplement to DHL's brief on this appeal.

elements of review to which the preliminary plan is subjected are therefore covered by a final plan review.

Even if the Board acted too quickly when it compressed its treatment of DHL's application, Weinstein has not shown on this appeal that she suffered prejudice as a result. In fact, the Board held a public hearing on DHL's preliminary plan. Weinstein participated at that proceeding. It then held a hearing on the final plan, at which she also participated. Thus, Weinstein was given the opportunity to be heard at these two meetings,[5] although the ordinance only requires the Board to conduct one such proceeding. Because the Board elected to hold a hearing after DHL had submitted a final plan, Weinstein thereby was in a position to make a presentation to the Board on any changes or additions to the proposal that had been submitted subsequent to the time she was heard on the preliminary plan. Weinstein has not demonstrated that she was deprived of an opportunity to evaluate and be heard on the application simply because the Board simultaneously treated the application as a preliminary and final plan, after the application had been already considered on the former basis.

The entry shall be:

For the foregoing reasons, this matter is remanded to the Town of Dedham Planning Board for further proceedings consistent with this order.

Dated: October 5, 2007

_____
Justice, Maine Superior Court

FILED &
ENTERED

OCT 15 2007

SUPERIOR COURT
HANCOCK COUNTY

---

[5] In fact, the record reveals that Weinstein or her representatives participated at more than these two meetings when the Board was considering various aspects of the subdivision application.